**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION**

HARLIN R. BROOKS
REG #26563-044                                                                                            PLAINTIFF

V.                                                    2:07CV00156 JLH/JTR

LINDA SANDERS,
Warden, FCI-FC, et al.                                                                             DEFENDANTS

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

**INSTRUCTIONS**

The following recommended disposition has been sent to United States District Judge J. Leon

Holmes. Any party may serve and file written objections to this recommendation. Objections should

be specific and should include the factual or legal basis for the objection. If the objection is to a

factual finding, specifically identify that finding and the evidence that supports your objection. An

original and one copy of your objections must be received in the office of the United States District

Clerk no later than eleven (11) days from the date of the findings and recommendations. The copy

will be furnished to the opposing party. Failure to file timely objections may result in waiver of the

right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or

additional evidence, and to have a hearing for this purpose before the United States District Judge,

you must, at the same time that you file your written objections, include a "Statement of Necessity"

that sets forth the following:

1.        Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence to be proffered at the requested hearing before the United States District Judge was not offered at the hearing before the Magistrate Judge.

3.      An offer of proof setting forth the details of any testimony or other evidence (including copies of any documents) desired to be introduced at the requested hearing before the United States District Judge.

From this submission, the United States District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A149
Little Rock, AR 72201-3325

## I.  Introduction

Plaintiff, who is currently incarcerated at the Federal Correctional Institution located in Forrest City, Arkansas ("FCI-FC"), alleges in this *Bivens* action that Defendants[1] failed to provide him with adequate medical care for an infection that ultimately resulted in the amputation of the first and fifth toes on his left foot.[2]  *See* docket entry #2.  Defendants have filed a Motion for Summary

---

[1]The Defendants in this action are FCI-FC Clinical Director Dr. Edna Prince, FCI-FC Warden Linda Sanders, FCI-FC Unit Manager T. Moore, BOP Regional Director G. Maldonado, Jr., and BOP Appeals Administrator Harrell Watts.  Plaintiff has not named as Defendants any of the FCI-FC nursing staff or any of the private or contract physicians who provided him with medical treatment.

[2]Plaintiff states, in a footnote to his Complaint, that he is claiming inadequate medical care for the treatment he received for his big toe *and* little toe on his left foot.  *See* docket entries #2 at 4, n.1, #36, #44, #45, #51, and #65.  However, his attached proof of exhaustion relates *only* to the medical care he received for his big toe.  *Id.*, attachments.  Erring on the side of caution, the Court will consider the medical care Plaintiff received for *both* toes; especially since failure to exhaust is an affirmative defense which Defendants have *not* asserted.

Judgment, a Brief in Support, and a Statement of Undisputed Facts.[3]  *See* docket entries #21, #22, and #23.  Plaintiff has filed two Responses, a Supplemental Response, a Statement of Disputed Material Facts, and a Reply.  *See* docket entries #36, #44, #45, #51, and #65.  Defendants have filed two Replies and Plaintiff's sealed medical records.  *See* docket entries #37, #54, and #57.

Before addressing the merits of Defendants' Motion for Summary Judgment,[4] the Court will briefly review the relevant facts.[5]

## A.    Plaintiff's Medical Treatment For Problems With His Left Big Toe

In August of 2001, Plaintiff was incarcerated in FCI-FC.  *See* docket entries #23, #44, and #57.  At that time, he was fifty years old and had been a diabetic for approximately thirty years.[6] *Id.* He was placed in the Chronic Care Clinic ("C.C. Clinic") so that he could receive regular medical treatment.[7]  Id.

---

[3]  Defendants titled their pleading "Motion to Dismiss, or In the Alternative, Motion for Summary Judgment."  *See* docket entry #21.  On July 14, 2008, the Court entered an Order notifying the parties that the pleading would be construed as a Motion for Summary Judgment because it contained supporting documentation which was not part of the record. *See* docket entry #42.

[4]  It is well settled that summary judgment should only be granted when the record, viewed in a light most favorable to the nonmoving party, shows that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 249-50 (1986).  The moving party bears the initial burden of informing the court of its basis for the motion and identifying the parts of the record that show lack of a genuine issue. *Celotex,* 477 U.S. at 323. To defeat a motion for summary judgment, the nonmoving party must go beyond the pleadings and establish "by affidavits, or by the depositions, answers to interrogatories, and admissions on file" that specific facts show a genuine issue for trial exists. *See* Fed R. Civ. P. 56(c); *Celotex,* 477 U.S. at 324.

[5]  Unless otherwise stated, these facts are undisputed.

[6]  Plaintiff received insulin injections at FCI-FC,  but it unclear at what age he became insulin dependent.

[7]  Importantly, Plaintiff is *not* challenging the adequacy of the medical treatment he received for his diabetes. Rather, he is challenging only the medical treatment he received for infections that

On April 18, 2005, Plaintiff was diagnosed with an infection in his left big toe.  *See* docket entries #23, #44, and #57.  He was given antibiotics and Ibuprofen for pain.  *Id.*  Over the next four months, he was prescribed oral antibiotics, a topical cream, pain medication, soaks in Betadine, and daily dressing changes.[8]  Additionally, Plaintiff was provided with open-toed shoes and a wheelchair. *Id.*

On September 6, 2005, a podiatrist under contract with FCI-FC debrided Plaintiff's big toe, cleaned the site with antibacterial soap, and applied a dressing.  *Id.*  Thereafter, Plaintiff received oral and intramuscular antibiotics and numerous dressing changes in the C.C. Clinic. *Id.*  Nevertheless, his condition worsened. *Id.*

On November 1, 2005, Plaintiff was admitted into Baptist Memorial Hospital in Forrest City, Arkansas, where he was treated by Dr. Henein Iskander, a private surgeon.  *Id.*  Plaintiff received IV antibiotics and a blood flow study, which revealed "calcification of his blood vessels, most probably due to diabetes for a long time." *See* docket entry #57, Ex. A  (Baptist Memorial 11-2-2005 Discharge Summary).  Additionally, Dr. Iskander concluded that Plaintiff's "peripheral vascular disease and gangrene are caused by his diabetes." *Id.*

On November 2 or 3, 2005, Plaintiff was transferred to St. Francis Hospital in Memphis, Tennessee, for further evaluation and possible reconstruction of his blood vessels.  *Id.*  While a

---

led to the amputation of the big and little toes on his left foot.  *See* Complaint and attached grievances (docket entry #2, attachments).

[8] The parties dispute whether Plaintiff complied with the prescribed daily dressing changes. *See* docket entries #23 and #44.

-4-

patient in St. Francis Hospital, he was seen by four private physicians[9] who diagnosed him with dry

gangrene of the big toe, peripheral vascular disease, chronic critical left leg ischemia, and peripheral

neuropathy.   *See* docket entry #57, Ex A (St. Francis 11-3-05 History and Physical; 11-4-05

Consultation Report; and 11-10-05 Discharge Summary).   One of these doctors performed a left

anterior tibial arthrectomy, which resolved Plaintiff's restricted  blood flow *only* to the ankle.   *Id.*

These doctors agreed that there were no other options for improving the blood flow to Plaintiff's left

foot, and that amputation of his big toe was *not* in his best interest.[10]  *Id.* On November 10, 2005, he

was discharged from St. Francis Hospital with instructions to treat his dry gangrene conservatively,

with medications and routine wound care.[11]  *Id.*

---

[9]This team of physicians included: (1) Dr. David M. Sharfman, an internal medicine specialist; (2) Dr. Jeffery B. Gibson, a general surgeon; (3) Dr. Timothy J. Powell, a cardiothoracic and vascular surgeon; and (4) Dr. Peter Lindy, an orthopedic surgeon. *See* docket entry #57, Ex. A and www.healthgrades.com.

[10] Specifically, the November 10, 2005 Discharge Summary from St. Francis Hospital states that:

> The patient underwent left anterior tibial arthrectomy with good resolution of flow but unfortunately the flow past the ankle remained poor. Subsequently, it was felt that there were limited therapeutic options for the patient.  The patient was interested in investigating amputation of the left great toe; however, it was felt this would probably *not be in his best interest*.  Orthopedics was consulted and they confirm our opinion.  Subsequently, it was the opinion of both Dr. Powell, Dr. Lindy, and myself that at this time, the patient should be *managed conservatively*. He seemed agreeable to this and was subsequently discharged back to the Federal Correction Institute in Forest City.

*See* docket entry #57, Ex. A at 2 (emphasis added).

[11]These medications included several types of insulin, Plavix (an anti-platelet agent), antibiotics, and Pletal (a vaso-dialator).  *Id.*

-5-

Over the next two months, Plaintiff was seen numerous times by staff in the C.C. Clinic. His medications were continued, his dressings were change, and he received pain medications. *See* docket entries #23, #44, and #57. Nevertheless, the dry gangrene on his left big toe worsened. *Id.*

On January 9, 2006 , Plaintiff was admitted into Baptist Memorial Hospital and given IV antibiotics. *See* docket entry #57, Ex. A (Baptist Memorial 1-9-06 History and Physical; 1-13-06 Report of Operation; and 1-20-06 Discharge Summary). Four days later, a private physician amputated Plaintiff's left big toe. *Id.* Prior to his discharge on January 20, 2006, the notes of Plaintiff's treating physician reflect that the wound was healing well. *Id.*

After returning to the C.C. Clinic, Plaintiff was given antibiotics and dressing changes for his wound. See docket entries #23, #44, and #57. On March 9, 2006, he was seen by a contract surgeon, who noted that the amputation wound was healing well. *Id.*

**B.     Plaintiff's Medical Treatment For Problems With His Left Little Toe**

On March 1, 2006, the C.C. Clinic staff noted a 1/2 inch red area on the lateral side of Plaintiff's left foot. *See* docket entries #23, #44, and #57. On March 15, 2006, the same area appeared red, but not blistered. *Id.* A pad was applied to the area, and Plaintiff was reminded to loosen his shoes and not let his foot rub against the wheelchair. *Id.*

On May 10, 2006, a dime-sized lesion was noted on the outside of Plaintiff's left foot, near his little toe. *Id.* The next day, Plaintiff was admitted into Forrest City Medical Center, where he was given IV antibiotics for treatment of dry gangrene. *See* docket entry #57, Ex. A (Forrest City Medical Center 5-11-06 History and Physical; 5-15-06 Report of Operation; and 5-18-06 Discharge Summary). On May 15, 2006, the wound was debrided, and on May 18, 2006, Plaintiff was discharged. *Id.*

After returning to the C. C. Clinic, Plaintiff received oral antibiotics and regular dressing changes, but the dry gangrene gradually worsened. *See* docket entries#23, #44, and #57. On June 8, 2006, a private surgeon determined that it might be necessary to amputate Plaintiff's left little toe. *Id.* On July 13, 2006, Plaintiff was seen by a private podiatrist who debrided the area, and recommended that it be cleaned and dressed regularly. *Id.* It appears that the C.C. Clinic staff complied with those instructions. *Id.* Nevertheless, Plaintiff's condition worsened.

On August 9, 2006, Plaintiff was admitted into Forrest City Medical Center where he received IV antibiotics. *See* docket entry #57, Ex. A (Forrest City Medical Center 8-9-06 History and Physical, 8-11-06 Report of Operation, 8-25-06 Discharge Summary). On August 11, 2006, Plaintiff's left little toe was amputated, and on August 18, 2006, he received a skin graft. *Id.* On August 25, 2006, Plaintiff was discharged from the hospital, and, after returning to the C.C. Clinic, he received routine dressing changes, antibiotics, and pain medications. *Id.*; docket entries #23, and #44. It appears that the wound for the amputation healed without any complications. *See* docket entry #57.

## II.  Discussion

In *Estelle v. Gamble*, 429 U.S. 97, 104-08 (1976), the Court held that the Eighth Amendment's cruel and unusual punishment clause allows prisoners to sue prison officials who are deliberately indifferent to their serious medical needs. To succeed on an inadequate medical care claim, a prisoner must prove that: (1) he had an objectively serious medical need; and (2) prison officials subjectively knew of, but deliberately disregarded, that serious  medical need. *Estelle v. Gamble,* 429 U.S. 97 (1976); *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997).

## A.      Objectively Serious Medical Need

The Court concludes that the infections of Plaintiff's big toe and little toe unquestionably were an "objectively serious" medical need.  *See Pool v. Sebastian County, Ark.*, 418 F.3d 934, 944 (8th Cir. 2005) (explaining that an objectively serious medical need is a condition that has been diagnosed by a physician as requiring treatment or if it is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention"); *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (same).  Thus, Plaintiff has met the first *Estelle* requirement.

## B.     Deliberate Indifference

In elaborating on the evidence necessary to establish the second *Estelle* requirement, the Eighth Circuit has explained that deliberate indifference "requires proof of a reckless disregard of the known risk." *Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001).  In other words, "there must be actual knowledge of the risk of harm, followed by deliberate inaction amounting to callousness." *Bryan v. Endell*, 141 F.3d 1290, 1291 (8th Cir. 1998).[12]  Finally, in *Dulany*, 132 F.3d at 1243, the Eighth Circuit made it clear that a delay in medical treatment is actionable only if a prisoner presents "verifying medical evidence" that the defendants "ignored an acute or escalating situation or that delays adversely affected the prognosis."[13]

### 1.     Alleged Delay In Examination Or Treatment Of Plaintiff's Left Big Toe

According to Plaintiff, on July 14, 2005, he filed an Inmate Request to Staff  asking

---

[12]It is well settled that negligence or even gross negligence in making treatment decisions is insufficient to establish a constitutional violation.  *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006); *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 2001).  Likewise, a prisoner's disagreement with a medical provider's treatment decisions does not rise to the level of a constitutional violation.  *Id.*

[13] In other words, "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay." *Crowley v. Hedgepeth,* 109 F.3d 500, 502 (8th Cir.1997)

Defendant Prince to allow him to be seen by an outside specialist for treatment of the infection in his left big toe.  *See* docket entry #2, Ex. attachments.   Plaintiff asserts that Defendant Prince did not answer that Inmate Request.[14]  *Id.*  On October 14, 2005, Plaintiff filed an Informal Resolution alleging that Defendant Prince had refused to p*ersonally* examine or treat him.  *Id.* Plaintiff concedes that, on October 20, 2005, he saw Defendant Prince.  *Id.*

Plaintiff alleges that Defendant Prince's delay in personally examining or treating him adversely affected his prognosis.[15]   *See* docket entry #2.  It is unclear from the provided medical records if Defendant Prince personally examined or treated Plaintiff prior to October 20, 2005. However, in her sworn affidavit, Defendant Prince states that she supervised Plaintiff's medical care throughout his incarceration in FCI-FC.  *See* docket entry #22, Ex. A.  Additionally, the unrefuted medical records demonstrate that, on numerous occasions prior to October 20, 2005, Defendant Prince reviewed Plaintiff's treatment notes and entered medical orders.  *See* docket entry #57. Finally, Plaintiff has *not* presented any verifying medical evidence demonstrating that Defendant Prince ignored an acute and escalating situation or that her alleged delay in personally examining or treating him adversely affected his prognosis.  Rather, the medical evidence (including the medical records completed by private physicians who are not parties to this action) demonstrates that the amputation of Plaintiff's left big toe was a consequence of his chronic, long-term diabetes and peripheral vascular disease.  Accordingly, Defendants are entitled to summary judgment on this claim.

---

[14] It is well settled that the failure to respond to a grievance, standing alone, is not actionable. *See Lomholt v. Holder*, 287 F.3d 683, 684 (8th Cir. 2002); *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993)

[15] Defendants have not addressed this claim in their pleadings.

2.       **Alleged Inadequate Medical Care Prior To Amputation Of Plaintiff's Toes**

According to Plaintiff, he also received inadequate medical care *prior to* the amputation of

his left big toe and little toe.  *See* docket entries #2, #36, #44, #45, #51, and #65.  However, the

*unrefuted medical records* demonstrate that, as soon as problems were discovered with those toes,

the C.C. Clinic staff began treating the infections with antibiotics, creams, Betadine soaks, pain

medications, and frequent dressing changes.  *See* docket entries #23, #44, and #57.  Staff also

provided him with open-toed shoes and a wheelchair.  *Id.*

Prior to the amputations, Plaintiff also was treated by contract podiatrists and private

physicians who debrided the infected areas, and performed a tibial arthrectomy in an unsuccessful

attempt to open the restricted blood flow to his left foot.  *Id.*  Importantly, the private specialists

determined that the gangrene was caused by Plaintiff's chronic diabetes and *incurable* peripheral

vascular disease, and that the infection should be treated conservatively with medications.  *Id.*

Finally, the medical records demonstrate that the C.C. Clinic staff complied with those directions

until amputation was inevitable, and it is undisputed that the amputation wounds have healed.  *See*

*Logan v. Clarke*, 119 F.3d 647, 649-50 (8th Cir. 1997) (finding that prison doctors were not

deliberately indifferent when they treated the prisoner on "numerous occasions" and "made efforts

to cure the problem in a reasonable and sensible manner"); *Dulany,* 132 F.3d at 1240 (holding that:

"In the face of medical records indicating that treatment was provided and physician affidavits

indicating that the care provided was adequate, an inmate cannot create a question of fact by merely

stating that she did not feel she received adequate treatment").

In an attempt to create a genuine issue of material fact, Plaintiff has filed the sworn affidavit

of fellow FCI-FC prisoner, Dr. Ali Sawaf, a urologist who last practiced medicine in January of

2001.  *See* docket entry #51.  In his Affidavit, Dr. Sawaf states that Defendants:  (1) "misdiagnosed" the infection as paronychia,[16] rather than gangrene; (2) failed to appreciate that the infection was worsened or caused by Plaintiff's peripheral vascular disease; and (3) committed "medical negligence" in the diagnosis and treatment of Plaintiff's condition, which caused him to develop gangrene leading to the amputation of his toes.  *Id.*

There are several problems with Dr. Sawaf's affidavit.  First, Dr. Sawaf does not state whether he physically examined Plaintiff or reviewed his extensive medical records.  Instead, Dr. Sawaf states that his conclusions are based on a review of "Plaintiff's  medical report."[17]  *See Jackson v. Anchor Packing Co.*, 994 F.2d 1295, 1304 (8th Cir. 1993) (holding that "[c]onclusory affidavits, even from expert witnesses, do not provide a basis upon which to deny motions for summary judgment"); *see also Thorn v. Int'l Bus. Machs., Inc.,* 101 F.3d 70, 75 (8th Cir. 1996) (holding that a plaintiff could not defeat summary judgment by producing an affidavit from a medical doctor who did not examine the plaintiff or his medical records).

More importantly, Dr. Sawaf's conclusions do not create a genuine issue of a material fact relevant to Plaintiff's Eighth Amendment inadequate medical care claims against Defendants.  It is well settled that medical malpractice, gross negligence, or a disagreement with the course of medical care are insufficient to sustain a § 1983 inadequate medical care claim.  *Gibson*, 433 F.3d at 646;

---

[16]According to Dr. Sawaf's affidavit, paronychia is "is an inflammatory process due to a bacterial infection and has nothing to do with gangrene caused by diabetes."  *See* docket entry #51, at 1.

[17]Because prisoners are not allowed to see each other's medical records, it is unclear what "medical report" Dr. Sawaf may have reviewed.  Any inference that Dr. Sawaf actually reviewed Plaintiff's medical records is undermined by his assertion that Plaintiff was *never seen* by a podiatrist. *See* docket entry #57. Plaintiff's medical records reflect that *he was seen* by a podiatrist on at least two occasions. *See* docket entry #51.

*Estate of Rosenberg*, 56 F.3d at 37. Similarly, a doctor's misdiagnosis of a prisoner's medical condition – which is what Dr. Sawaf claims led to the amputation of Plaintiff's toes – does not constitute deliberate indifference under the Eighth Amendment. *Estelle*, 429 U.S. at 106 (providing that "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment"); *Bellecourt v. U. S.*, 994 F.2d 427, 431 (8th Cir. 1993) (holding that a prison doctor "misdiagnosed the [federal prisoner's] condition . . . does not amount to deliberate indifference in violation of the Eighth Amendment"). Accordingly, Defendants are also entitled to summary judgment on this claim.

**3. Defendant Prince's Alleged Refusal To Amputate Plaintiff's Left Big Toe In November of 2005**

Finally, Plaintiff alleges that Defendant Prince disregarded Dr. Iskander's November 2005 recommendation that Plaintiff's left big toe be immediately amputated, thereby causing him needless suffering for two additional months until the toe was amputated in January of 2006. *See* docket entry #36. This *unsupported allegation* is clearly contrary to the *unrefuted medical records* which demonstrate that, in November of 2005, Dr. Iskander transferred Plaintiff to St. Francis Hospital for further evaluation and possible reconstruction of the blood vessels to his left foot. *See* docket entry #57, Ex. A (Baptist Memorial 11-28-2005 Discharge Summary). Importantly, four private physicians at St. Francis Hospital determined that amputation of Plaintiff's big toe was *not* "in his best interest" and, instead, that the infection should be treated conservatively with medications. *See* docket entry #57, Ex. A (St. Francis 11-10-05 Discharge Summary). Accordingly, Defendants are also entitled to summary judgment on this claim.

### III. Conclusion

IT IS THEREFORE RECOMMENDED THAT:

1.      Defendants' Motion for Summary Judgment (docket entry #21) be GRANTED, and that this case be DISMISSED, WITH PREJUDICE.

2.      The Court CERTIFY, pursuant to 28 U.S.C. § 1915A, that an *in forma pauperis* appeal from any Order and Judgment adopting this Recommended Disposition would not be taken in good faith.

Dated this 10th day of December, 2008.

_____
UNITED STATES MAGISTRATE JUDGE